UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:16-cv-_____

CARLOS ENRIQUE HILLER SANCHEZ,                 **CLASS ACTION UNDER S.D. FLA. L.R. 23.1**
individually and for others similarly situated,

      Plaintiff,

vs.

RAYMOND JAMES & ASSOCIATES, INC.,
a Florida corporation, and JOEL BURSTEIN,
a Florida resident,

      Defendant.
_____/

## COMPLAINT

The plaintiff, CARLOS ENRIQUE HILLER SANCHEZ, individually and on behalf of others similarly situated, files this complaint against the defendants, RAYMOND JAMES & ASSOCIATES, INC. ("RJAI") and JOEL BURSTEIN, alleging as follows:

### INTRODUCTION

1.     By this action, Mr. Hiller seeks to impose liability under federal securities law and state common law upon the defendants who knowingly designed the financial structure of a fraudulent scheme for one of their customers and then implemented that scheme to cause damage in an amount not less than $71.7 million to a specific class of investors that includes Mr. Hiller.

### THE PARTIES

2.     Mr. Hiller is a foreign national who was admitted to the United States as a conditional resident under the Immigrant Investor Program a/k/a the EB-5 Program, so named because of the employment-based fifth preference visa that participants receive under this program.  INA §203(b)(5), 8 U.S.C. § 1153(b)(5).

3.      RJAI, a Florida corporation with its principal place of business in this state, is a brokerage firm with offices throughout the world, including, without limitation, three branch offices in Miami-Dade, Florida.  RJAI became the asset manager for a fraudulent development program connected to a ski resort in Jay, Vermont (the "Jay Peak Resort").

4.      Mr. Burstein is an individual who resides in Miami-Dade, Florida.  At all times material hereto, Mr. Burstein was employed by RJAI as a manager in the Miami-Dade area.

5.      This is an action in which Mr. Hiller seeks damages that he has suffered as a result of the facilitation of a fraudulent scheme by the defendants.  The defendants chose to knowingly assist one of their customers, Ariel Quiros, in perpetrating a fraud.  Mr. Quiros defrauded Mr. Hiller and other similarly situated investors into investing in the Jay Peak Resort. As explained further below, the defendants designed and implemented the fraud.

### JURISDICTION AND VENUE

6.      Pursuant to either 28 U.S.C. 1331, 28 U.S.C. 1332(a)-(c), or the Class Action Fairness Act of 2015 ("CAFA"), 28 U.S.C. § 1332(d)(2), this Court has original jurisdiction over this class action that involves more than 100 members and a matter in controversy that exceeds $5,000,000, exclusive of interest and costs.  The members of the class are individuals who are citizens of foreign states who have not been lawfully admitted for permanent residence in the United States.  Not more than two-thirds of the members of the proposed class of plaintiffs are citizens of the State of Florida or permanent residents of the United States domiciled in the State of Florida.

7.      This Court has personal jurisdiction over the defendants, both of whom are citizens of the State of Florida.

8.      Venue for this action is proper in this judicial district because much of the conduct that is the basis for this action was committed in this judicial district by defendants who may be found in this judicial district.  From within this judicial district, the defendants designed and implemented a fraud by Mr. Quiros, himself a citizen of the State of Florida, who also may be found in this judicial district.  There also exist other actions already filed in this judicial district that relate to the subject matter of this action.

**RELATED ACTIONS**

9.      On April 12, 2016, the Securities and Exchange Commission (the "SEC") commenced a civil enforcement action (the "SEC Enforcement Action") against Mr. Quiros, William Stenger ("Mr. Stenger"), and others in the United States District Court for the Southern District of Florida, Case Number 16-21301-cv-Gayles, captioned as SEC vs. Mr. Quiros, *et al.*

a. In the eighty-one page Complaint filed in the SEC Enforcement Action (the "SEC Complaint"), the SEC asserts the existence of a "massive eight-year fraudulent scheme," beginning in 2008 and continuing in multiple phases until 2016, during which Mr. Quiros "systematically looted $50 million" from the $365 million invested by Mr. Hiller and hundreds of other investors from 74 countries in the Jay Peak Resort, which became a multi-faceted fraud that included, *inter alia*, "an intricate web of [financial] transfers."

b. In the SEC Enforcement Action, the SEC asserts claims under federal securities law against Mr. Quiros, Mr. Stenger, and sixteen other entity defendants (denominated in the SEC's complaint as the "Corporate Defendants"), who are alleged to be liable for the fraudulent scheme.  In addition, the SEC names four other entities as "Relief Defendants," *i.e.*, defendants who allegedly received "ill-gotten" gains from the Corporate Defendants.  (The Corporate and Relief Defendants are hereinafter referred to as the "Jay Peak Entities.")

c. Soon after the SEC Enforcement Action was filed, the district court entered *ex-parte* orders that (i) froze all the assets of ten of the twenty-one defendants in the SEC Enforcement Action, and (ii) appointed Attorney Michael I. Goldberg as plenary receiver (hereinafter, the "Receiver") of all the nineteen of the Jay Peak Entities.

d. According to the order that appointed the Receiver, the right to assert actions on behalf of the Jay Peak Entities was assigned to the Receiver, and lawsuits against the Receiver, the Jay Peak Entities, and the assets of these persons were stayed/enjoined.

e. Neither RJAI nor Mr. Burstein have been sued in the SEC Enforcement Action, although the SEC Complaint indicates that both defendants were involved in the fraudulent scheme perpetrated by Mr. Quiros.

10.     On April 14, 2016, Susan L. Donegan, as the Commissioner of the Vermont Department of Financial Regulation (VDFR) and the Vermont Attorney General, William Sorrell, commenced a civil enforcement action (the "VDFR Enforcement Action") against Mr. Quiros, Mr. Stenger, and others in the Superior Court of Washington County, Case Number 217-4-16, captioned as VDFR, *et al.* vs. Mr. Quiros, *et al.*

a. In the fifty-page Complaint filed in the VDFR Enforcement Action (the "VDFR Complaint"), the VDFR makes many of the same allegations as are contained in the SEC Complaint, yet did not join as defendants the so-called Relief Defendants named in the SEC Enforcement Action.  Like the SEC Enforcement Action, the VDFR Enforcement Action does not join either RJAI or Mr. Burstein as defendants.  The VDFR Complaint, however, like the SEC Complaint, indicates that RJAI and Mr. Burstein were involved in the fraud perpetrated by Messrs. Quiros and Stenger.

11.     On May 3, 2016, Alexandre Daccache commenced a class action (the "Daccache Class Action") against Mr. Quiros, Mr. Stenger, RJAI, and Mr. Burstein in the United States District Court for the Southern District of Florida, Case Number 16-21575-cv-FAM, captioned as Mr. Daccache, etc. vs. Mr. Quiros, *et al.*

a. In the forty-page Complaint filed in the Daccache Class Action, Mr. Daccache seeks to represent all of the investors in all seven phases of the Jay Peak Resort fraudulent development program.  The Daccache Class Action makes many of the same allegations as are contained in the SEC and VDFR Complaints.   The Daccache Class Action asserts claims against Mr. Quiros and Mr. Stenger that appear to overlap with the claims asserted in the SEC and VDFR Complaint.  Like the SEC and VDFR Complaints, the Daccache Complaint indicates that RJAI and Mr. Burstein were involved in the fraud perpetrated by Mr. Quiros.  Unlike the SEC Enforcement Action and VDFR Enforcement Action, the Daccache Class Action asserts claims against RJAI and Mr. Burstein.

**THE FACTS**

EB-5 PROGRAM IN GENERAL

12.     The Immigrant Investor Program, more commonly known as the EB-5 Program, was created by the United States Congress' Immigration Act of 1990.  Congress established the EB-5 program to stimulate the U.S. economy by giving immigrant investors the opportunity to permanently live and work in the United States after they have invested in a new commercial enterprise ("NCE").   In the case of an NCE that is located in a Targeted Employment Area ("TEA"), *i.e.*, either a rural area or an area beset by high unemployment, the required equity investment need only be $500,000.[1]

---

[1] The EB-5 Program is a pathway to residency for not only immigrant investors but also their spouses and unmarried children under the age of twenty-one.

13.     The EB-5 Program is administered by the United States Citizenship and Immigration Services (the "USCIS"), and the total number of immigrant investor visas issued each year under the EB-5 program is 10,000.   https://www.uscis.gov/sites/default/files/ USCIS/Resources/ Resources for Congress/ Congressional Reports/EB-5 Investor Pilot Program.pdf (citing 8 U.S.C. § 1153(b)(5)).

14.     In 1993, Congress created the Immigrant Investor Pilot Program to increase interest in the EB-5 visa program. This new pilot program established EB-5 Regional Centers. Regional centers are entities that receive special designation from the USCIS to administer EB-5 investments and create jobs.  Public and private entities may apply to the USCIS for approval as an EB-5 Regional Center.

15.     EB-5 visa programs administered by a Regional Center provide more flexibility, because the immigrant investor who invests in such a program is permitted to take credit not only for direct jobs created in the NCE but also "indirect jobs" created outside the NCE in a job creating enterprise ("JCE"), such as a construction contracting firm that builds an improvement for the NCE.  In addition, the immigrant investor need not handle the day-to-day management of the NCE nor even necessarily live in the region where the NCE is located.

16.     By necessity, investments into an EB-5 program are "close-ended," available only to a specified number of investors, which number is tied to the number of direct or indirect jobs created by the investment.  If too few jobs are created with the money invested, the immigrant will not be able to become a permanent resident in the United States.

EB-5 PRACTICE AND PROCEDURE

17.     Under the EB-5 program, the immigrant investor first applies for an immigrant visa by submitting a Form I-526, Immigrant Petition for Alien Entrepreneur, the approval of which by the USCIS is conditioned upon, *inter alia*, the immigrant's investment of the requisite

amount of money in the NCE. Upon approval of Form I-526 petition, the immigrant investor may either: (1) file Form I-485, Application to Register Permanent Residence or Adjust Status, with USCIS to adjust status to a conditional permanent resident within the United States; or (2) file an Application for Immigrant Visa and Alien Registration, with the U.S. Department of State to obtain an EB-5 visa for admission to the United States.  Upon the approval of the I-485 application or upon entry into the United States with an EB-5 immigrant visa, the EB-5 investor and derivative family members will be granted conditional permanent residence for a two-year period.

18.     In order to remove the conditional resident status the immigrant investor must file Form I-829, Petition by Entrepreneur to Remove Conditions, ninety days before the two-year anniversary of the granting of the EB-5 investor's conditional resident status.  USCIS' approval of the Form I-829 is conditioned upon proof that the immigrant investor's equity investment has created at least ten full-time jobs in the NCE or a JCE.  If an insufficient number of jobs are created, the foreign national is subject to removal from the United States, unless the USCIS believes it to be reasonable to extend the job-creation deadline, which, except in the most extreme circumstances, will not be extended beyond the third anniversary of the date of approval of the immigrant investor's permanent resident status with conditions.  *See* USCIS PM-602-0083, § V(A)(2), p. 22 (May 13, 2015) [hereinafter *USCIS EB-5 Adjudications Policy*]. [2]

THE VERMONT REGIONAL CENTER

19.     Very few states have ever operated Regional Centers for the EB-5 program.  In 1997, Vermont was the first state to form a Regional Center approved by the USCIS.  Vermont's

---

[2] Details about the NCE and the JCE must be provided in both the Forms I-526 and I-829 filed by the immigrant investor.  *Id.*

Regional Center ("VRC") is operated by the Vermont Agency of Commerce & Community Development in partnership with the VDFR.

20.     From inception, the VRC has been supported by many of Vermont's leading politicians.   U.S. Senator Patrick Leahy, U.S. Senator Bernard Sanders, former Vermont governors, Howard Dean and James H. Douglas, and the current Vermont Governor, Peter Shumlin, have all endorsed and popularized the VCR and the use of the EB-5 program in Vermont.  The EB-5 programs that are the subject of this dispute were approved by the VRC, and the politicians named above have all been connected in one way or another to the EB-5 programs operated at the Jay Peak Resort.

THE INITIAL EB-5 PROGRAM AT THE JAY PEAK RESORT

21.     Jay Peak, a mountain located about five miles south of the United States border with Canada, spans across three counties of Vermont, including Orleans County, and is the highest point in the mountain range known as the Green Mountains.

22.     In 1978, Jacques Herbert, through Mont St. Sauveur International, Inc. ("MSSI"), purchased the Jay Peak Resort, then exclusively a winter-season ski resort.

23.     In the 2000's, the general manager of the resort, Mr. Stenger, encouraged Mr. Herbert to raise financing for the Jay Peak Resort with an EB-5 program.

24.     Jay Peak Hotel Suites L.P. (later known as the "Phase 1 Partnership") was launched in December 2006 to raise $17.5 million from thirty-five investors to build another hotel with sixty rooms.  Jay Peak Management, Inc. ("JPMI") was the general partner of the Phase 1 Partnership, and Mr. Stenger its president.   Mr. Quiros never held any officer or director position in JPMI.

a.   All investors were required to pay an administrative fee of $50,000.  The price for one limited partnership unit was set at $500,000, which amount an immigrant was required to invest to qualify for conditional residency under the EB-5 program.

b.   All investors were provided with uniform written offering materials that included a written business plan that represented the use that would be made of the funds that the investor contributed, including the improvement to be constructed with the monies invested and how development would lead to the creation of jobs, which information was required by federal immigration law to be included with the Forms I-529 submitted by immigrant investors to the USCIS.  8 C.F.R. § 204.6.

c.   All investors were provided with uniform offering materials that included a written formation document for the Phase 1 Partnership that identified the general partner of the partnership and its president.

d.   In addition, the formation document stated that (i) the business of the partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts at banks or financial institutions in the name of the partnership, which accounts were to controlled by the general partner;  (iii) the general partner would not borrow from the funds of the partnership; (iv) the general partner would not permit the monies contributed to the partnership to be commingled with the funds of another person; and (v) the general partner would not encumber the monies contributed to the partnership.

 MR. QUIROS GAINS CONTROL OF THE RESORT'S OPERATIONS AND EB-5 PROGRAM

25.   Mr. Herbert passed away in March 2006, and his family later decided to sell the Jay Peak Resort, then about fifty years old, as credit tightened and the economy contracted.

26.   Meanwhile, the general manager of the Jay Peak Resort since 1984, Mr. Stenger wanted to ensure the continuation of the resort and no doubt his own employment there.  He

identified Mr. Quiros, a resident of Key Biscayne, Florida, as someone who could purchase the Jay Peak Resort and expand operations there.

27.     As of 2008, Mr. Quiros had absolutely no experience in the hotel industry or with the EB-5 program yet represented himself to be a businessman with leadership skills, who had conducted a successful trading business between the United States and Asia for three decades.

28.     Initially portrayed to politicians, regulators and the townspeople of Jay, Vermont as someone with not only a passion for Jay Peak but also connections to Asia that would enable him to develop the resort with financing from the EB-5 Program, Mr. Quiros was able to persuade the Herbert family, who were the beneficial owners of Jay Peak, Inc. ("JPI"), then the owner of the Jay Peak Resort, to let him take charge of the resort's operations so he could study same before closing on a contract to purchase all of the issued and outstanding stock in JPI pursuant to a stock transfer contract made in January 2008 yet not finalized until June 2008.

29.     While the capital being raised pursuant to the EB-5 Program initially involved only one phase of development for $17.5 million in financing, Mr. Quiros envisioned many more phases, much more development, and much greater financing for the Jay Peak Resort through the EB-5 Program.

30.     In 2008, even before Mr. Quiros completed his purchase of the Jay Peak Resort, he and Mr. Stenger sought to raise additional financing for the Jay Peak Resort through the EB-5 Program.

31.     Jay Peak Hotel Suites Phase II L.P. (the "Phase 2 Partnership") was launched in March 2008 to raise $75 million from 150 investors to make the Jay Peak Resort an all-season facility with another hotel with sixty rooms and ancillary projects, including an indoor water

park, golf clubhouse, indoor ice arena, and bowling center.  JPMI also was the general partner of the Phase 2 Partnership.

  a. Again, all investors were required to pay an administrative fee of $50,000.  Again, the price for one limited partnership unit was set at $500,000, which amount an immigrant was required to invest to qualify for conditional residency under the EB-5 program.

  b. Again, the uniform written offering materials for this partnership included a written business plan and written formation document in the form of a limited partnership agreement for the Phase 2 Partnership in which documents the same representations that were made to the investors in the Phase 1 Partnership, as alleged in sub-paragraphs (b) through (d) of paragraph 24 above, were tailored and repeated to the investors in the Phase 2 Partnership in a business plan and limited partnership agreement specifically created for the Phase 2 Partnership.

32. Eventually, once Mr. Quiros obtained control of the Jay Peak Resort, he and Mr. Stenger, assisted by the defendants, used the EB-5 Program to commence six more limited partnerships to raise total financing of $365 million from 730 investors from seventy-four different nations.

MR. QUIROS ENLISTS THE ASSISTANCE OF THE DEFENDANTS IN 2008

33. After interning at RJAI in 1991, Mr. Burstein was employed by RJAI in 2001 and in 2004 he was chosen from the firm's ranks of financial planners to become a manager.

34. First acquainted with Mr. Quiros in 2004, Mr. Burstein thereafter regularly vacationed with Mr. Quiros and his family at the Jay Peak Resort.

35. At some point before Mr. Quiros became involved in the operations of the Jay Peak Resort, Mr. Burstein opened up a personal account for Mr. Quiros and his wife, thus, gaining knowledge of the financial condition of Mr. Quiros.

36. Mr. Burstein married Mr. Quiros' daughter in 2006 and had a child with her.

37.     In early 2008, before Mr. Quiros acquired the Jay Peak Resort from MSSI, he advised his son-in-law that he was buying the resort, which came with a development program comprised of two limited partnerships formed to raise money pursuant to the EB-5 Program, which development program he intended to expand.

38.     Mr. Quiros asked his son-in-law to design a financial structure that would give him control over not only the resort and all of its assets but also all assets (even capital contributions) of the two limited partnerships already existing and others to be created for future development at the resort with financing raised pursuant to the EB-5 Program.

39.     In February 2008, according to FINRA, Mr. Burstein, was a broker and investment advisor, with approximately seven years of experience, who had passed six separate industry/product examinations.

THE DEFENDANTS DESIGN AND COMMENCE THE FINANCIAL STRUCTURE FOR THE SCHEME

40.     During the first half of 2008, Mr. Quiros met with Mr. Burstein and Frank Amigo.[3] During this meeting, the participants discussed a financial structure for the limited partnerships used to raise financing for the Jay Peak Resort pursuant to the EB-5 Program.

41.     RJAI, through Messrs. Quiros and Amigo, agreed that Mr. Quiros could take control of the capital contributions of the limited partnerships formed pursuant to the EB-5 Program, without any regard for what the immigrant investors were told in the business plans and limited partnership agreements.  It was agreed between Mr. Quiros and the defendants that Mr. Quiros would also commingle the assets and liabilities of separate entities.

42.     The defendants further agreed as follows:

---

[3] According to FINRA, Mr. Amigo and Mr. Burstein both began working at RJAI in 2001.  Since that time, Mr. Burstein has reported to Mr. Amigo.  According to FINRA, in 2008, Mr. Amigo already had approximately eighteen years of experience in the industry and had passed six separate industry/product examinations.

a.   Mr. Quiros would open accounts at RJAI for the Phase 1 and 2 Partnerships and any future partnership that might be formed for development at the Jay Peak Resort and financed by investments made pursuant to the EB-5 Program.

b.   Mr. Quiros would obtain sole signature authority on all accounts established for the Phase 1 and Phase 2 partnerships and other limited partnerships to be formed to attract investment money through the EB-5 Program, with the ability to transfer and spend the money as he saw fit.

c.   All investments made by the limited partners, including, without limitation, the investors in the later partnership, such as Mr. Hiller, would be initially transmitted to accounts of the partnerships located, primarily, if not exclusively, at the People's Bank in Burlington, Vermont.  Each partnership, through its general partner, would have control of the funds on deposit in this bank account in Vermont.

d.   Mr. Stenger, on behalf of the general partner for the limited partnership, would then transmit the funds from the bank accounts in Vermont, to accounts in the name of the partnership at RJAI, for which Mr. Quiros, individually, was the sole signatory.

e.   Mr. Quiros would open an account at RJAI for Q Resorts, Inc. ("Q Resorts"), a holding company that would become the sole owner of Jay Peak, Inc. ("JPI"), the entity through which Mr. Quiros planned to acquire the Jay Peak Resort.

f.   RJAI would establish a multi-purpose margin loan for which all accounts at RJAI connected to the Jay Peak Resort, including all accounts then established or to be established in

the future for the limited partnerships participating in the EB-5 Program, and other accounts connected to Mr. Quiros, such as, for example, the account of Q Resorts, would be liable.[4]

  g. RJAI would convert into treasury bills the funds on deposit in the partnership accounts at RJAI and then collateralize the multi-purpose margin loan with these treasury bills, which became the borrowing base for the loan.

  h. Q Resorts and Mr. Quiros would be able to use the margin loan and monies invested in the Phase 1 and Phase 2 Partnerships to complete the purchase of the resort.

  i. All monies raised by future limited partnerships participating in the EB-5 Program at the Jay Peak Resort also would be converted into treasury bills, and RJAI would permit advances on the margin loan to Mr. Quiros, Q Resorts, and other entities Mr. Quiros formed without regard to the purpose of each of the limited partnerships and for the benefit of Mr. Quiros and these entities.

  43. According to Mr. Quiros, RJAI designed this financial structure, and RJAI and the financial structure RJAI created provided "great support" to him in all that he accomplished at the Jay Peak Resort from 2008 through 2014.

  44. Each contrived aspect of the financial structure that the defendants created was an artifice for the massive fraud that was perpetrated upon the investors from 2008 until 2014.

  45. Equipped with a financial structure not only recommended but also implemented by the defendants with utter disregard for the rights of the investors, the development program financed by immigrant investors through the EB-5 Program became a "Ponzi" scheme run amok.

---

[4] From June 2008 through March 2014, Mr. Quiros opened and closed four margin loans at RJAI. These margin loans were used for a variety of impermissible purposes, including, without limitation, commingling the assets and liabilities of the separate limited partnerships participating in the EB-5 Program and the making of payments to or for Mr. Quiros and companies he controlled often for purposes unrelated to the limited partnerships.

46.     From the outset, the defendants understood that the investors in the limited partnerships were contributing money to the limited partnerships pursuant to the EB-5 Program, which necessarily meant that the limited partnerships were close-ended funds that would use their monies to create jobs pursuant to a business plan submitted to the USCIS.

47.     From the outset, the defendants knew that a multi-purpose margin loan cross-collateralized by the assets of disparate entities was impermissible as it would commingle the assets and liabilities of distinct entities, the assets of which would become collateral for a margin loan.

48.     As alleged further below, whenever improprieties were brought to the defendants' attention, regardless of who was the source of the criticism, Mr. Burstein and other managers at RJAI turned a "blind eye" to the criticism that swirled around them.

49.     RJAI was well-compensated for looking the other way while managing assets according to the structure that the defendants put into place for Mr. Burstein's father-in-law. [5]

MISUSE OF IMMIGRANT INVESTMENTS TO ACQUIRE THE JAY PEAK RESORT

50.     As a result of the financial structure designed and implemented by the defendants, Mr. Quiros purchased the Jay Peak Resort with $22 million of "other people's money" (OPM).

51.     Prior to closing on June 23, 2008 on the stock purchase, the owner of the resort and then the holder of the capital contributions of the investors for the Phase 1 and 2 Partnerships, explicitly warned the defendants, in writing, before transferring the investment monies to RJAI and that these monies must not be used by Q Resorts to pay the purchase price.

---

[5] According to the defendants' financial structure, a multitude of treasury bills were purchased with capital contributions of hundreds of investors in the Jay Peak Resort, thus, earning RJAI hundreds of thousands of dollars in fees or commissions from 2008-2014.  In addition, $2 million in interest payments were made by RJAI on the margin loans.  In short, the investors paid all the transaction costs for the implementation of a financial structure that was designed by the defendants to exploit them.

52.     The defendants "shook off" this warning, booked the business of Mr. Quiros at RJAI, and took the monies into the accounts that RJAI had established for the Phase 1 and 2 Partnerships and for which Mr. Quiros was the sole signatory.

53.     The defendants then permitted Mr. Quiros to immediately use these funds to make a payment from an account that he had opened at RJAI for Q-Resorts.

54.     Despite the sellers warning that what the defendants were doing was fundamentally wrong, the defendants permitted Mr. Quiros to use the monies invested by the limited partners in the Phase 1 and 2 Partnerships to purchase the Jay Peak Resort.

55.     The use of the investment monies to finance the transfer of ownership of the resort was an entirely inappropriate use of financing raised through the EB-5 Program.  The money of the investors was not used to create jobs but merely to increase Mr. Quiros' wealth.

56.     And, so, because of the misconduct of the defendants, the greatest "Ponzi" scheme in the history of the State of Vermont was set into motion in June 2008.

2008-12:   EXPANSION OF THE DEVELOPMENT PROGRAM AT JAY PEAK

57.     From the closing in June 2008 through the last quarter of 2012, Mr. Stenger and Mr. Quiros touted the Jay Peak Resort as a pathway to United States residency all over the world.

58.     As the Phase 1 and 2 Partnerships were being sold out, Mr. Quiros directed the Jay Peak Resort's securities lawyers in Vermont to roll-out successive partnerships to solicit more investments to raise more financing through the EB-5 Program for other development purposes, including those set forth below:

a.   Jay Peak Penthouse Suites L.P. (the "Phase 3 Partnership") was launched in July 2010 to raise $32.5 million from sixty-five investors to build a hotel comprised of fifty-five "penthouse suites" and an activities center comprised of a bar and restaurant.  Jay Peak GP

Services, Inc. ("Jay Peak GP") was the general partner of the Phase 3 Partnership, and Mr. Stenger the sole principal of the general partner.

b.   Jay Peak Golf and Mountain Suites L.P. (the "Phase 4 Partnership") was launched in December 2010 to raise $45 million from ninety investors to build "golf cottage" duplexes, a wedding chapel, and other facilities.  Jay Peak GP Services Golf, Inc. ("Jay Peak GP Golf") was the general partner of the Phase 4 Partnership, and Mr. Stenger the sole principal of the general partner.

c.   Jay Peak Lodge and Townhouses L.P. (the "Phase 5 Partnership") was launched in May 2011 to raise $45 million from ninety investors to build thirty vacation rental townhouses, ninety vacation rental cottages, a café, and a parking garage.  Jay Peak GP Services Lodge, Inc. ("Jay Peak GP Lodge") was the general partner of the Phase 5 Partnership, and Mr. Stenger the sole principal of the general partner.

d.   Jay Peak Hotel Suites Stateside L.P. (the "Phase 6 Partnership") was launched in October 2011 to raise $67 million from 134 investors to build a hotel comprised of eighty-four units, another eighty-four vacation rental cottages, a guest recreation center, and a medical center.  Jay Peak GP Services Stateside, Inc. ("Jay Peak GP Stateside") was the general partner of the Phase 5 Partnership, and Mr. Stenger the sole principal of the general partner.

59.   The Phase 3-6 Partnerships were marketed the same way as the Phase 1 and 2 Partnerships, meaning, among other things,

a.   Again, all investors were required to pay an administrative fee of $50,000.  Again, the price for one limited partnership unit was set at $500,000, which amount an immigrant was required to invest to qualify for conditional residency under the EB-5 program.

b.   Again, the uniform written offering materials for each of these partnerships included a written business plan and written formation document in the form of a limited partnership agreement for each partnership in which the same representations that were made to the investors in the Phase 1 Partnership, as alleged in sub-paragraphs (b) through (d) of paragraph 24 above, were tailored and repeated to each class of investors in the Phase 3-6 Partnerships in a business plan and limited partnership agreement specifically created for each partnership.

THE JAY PEAK PHASE PROGRAM RUNS OUT OF MONEY

60.   By 2012, the repeated misuse of monies invested in the Phase 1-6 Partnerships, as generally described in paragraphs 42 and paragraph 49 began to take a toll on development at the Jay Peak Resort.

61.   Even though the capital raise for Phase 6 was completed by 2012, construction did not begin in spring of that year as promised in the offering materials.  Instead, construction commenced in April 2013.

62.   According to the business plan for the Phase 6 Partnership, all construction was to be completed by April 2014.  While the defendants were able to complete the hotel in 2013, the other improvements in the Phase 6 Partnership were materially delayed and remain incomplete.

THE PHASE 7 PARTNERSHIP

63.   Jay Peak Biomedical Research Park, L.P. (the "Phase 7 Partnership") was launched in November 2012 to raise $110 million from 220 investors to build, of all things, a "world-class" certified biomedical research facility in Newport, Vermont, in the County of Orleans, approximately twenty miles east of the Jay Peak Resort.  AnC Bio Vermont GP Services, LLC ("AnC Bio") was the general partner of the Phase 7 Partnership, and Mr. Quiros and Mr. Stenger were managing members of the general partner.

64.    The Phase 7 Partnership was marketed the same way as the Phase 1-6 Partnerships, meaning, among other things,

a. As was true for the investors in the Phase 1-6 Partnerships, the investors in the Phase 7 Partnership were required to pay an administrative or syndication fee of $50,000.  The price for one unit was $500,000, which amount an immigrant was required to invest to qualify for residency under the EB-5 program.

b. Again, the uniform written offering materials for the Phase 7 Partnership included a written business plan and written formation document in the form of a limited partnership agreement for the partnership in which the same representations that were made to the investors in the Phase 1 Partnership, as alleged in sub-paragraphs (b) through (d) of paragraph 24 above, were tailored and repeated to each of the investors in the Phase 7 Partnership in a business plan and limited partnership agreement created specifically for this partnership.

65.    According to the original written materials for this offering, all limited partnership units in the Phase 7 Partnership were to be sold by August 2013.  According to amended offering materials issued in May 2014, the capital raise was to be completed in August 2014.  In 2015, Mr. Stenger sent a letter to the investors in Phase 7, requesting that they agree that the capital raise be extended until September 30, 2015.  As of today, the Phase 7 Partnership has raised $83 million from 166 investors.[6]

66.    According to the original offering materials, the construction on the biomedical research facility was to begin in March 2013 and be completed in December 2014.  According to

---

[6] In the SEC Enforcement Action, the SEC has obtained a TRO that enjoins the use of the fraudulent offering materials to sell any more limited partnership interests in the Phase 7 Partnership.

the amended marketing materials, construction was to begin in January 2015 and be completed in May 2016.

THE FRAUD IN THE WRITTEN OFFERING MATERIALS FOR THE PHASE 7 PARTNERSHIP

67.     The various partnerships used to raise financing through the EB-5, including, without limitation, the Phase 7 Partnership,  were supported by written offering materials, which represented to the investors the source and uses of funds for each phase of development.

68.     This information was material to any investor, including, without limitation, the investors in the Phase 7 Partnership, most if not all of whom were immigrants.  None of the immigrant investors can obtain permanent residency unless his or her investment creates at least ten full-time jobs.

69.     Neither the business plan nor the limited partnership agreement for the Phase 7 Partnership at the Jay Peak Resort, like none of the business plans and limited partnership agreements for the earlier partnerships, disclosed or implied in any way that an investment in one partnership could be used for a development project undertaken by another partnership. [7]

70.     Likewise, the business plan and limited partnership agreement for the Phase 7 Partnership, like the business plans and agreements for the earlier partnerships, did not disclose or imply in any way that the funds of the partnership would be used to pay expenses for Mr. Quiros or one of the entities that he controlled for a purpose unrelated to the partnership.

71.     In fact, the limited partnership agreement for the Phase 7 Partnership, like the limited partnership agreement for all of the earlier partnerships, stated that there could no commingling of the funds of the partnership with the funds of any other person without the prior written consent of two thirds of the limited partners in the partnership.

---

[7] "In general, multiple EB-5 investors petitioning through a regional center on a standalone basis may not claim credit for the same specific new job." *USCIS EB-5 Adjudications Policy*, p. 20.

72.     Further, the limited partnership agreement for the Phase 7 Partnership, like the earlier limited partnership agreements, assured the limited partners that their investments would not be encumbered by the general partner without the consent of at least two-thirds of the persons holding limited partnership units in the limited partnership.

73.     Further, the limited partnership agreement for the Phase 7 Partnership, like the earlier limited partnership agreements, assured the limited partners that their investments would be under the direct control of the partnership's general partner.

74.     After Mr. Quiros acquired the Jay Peak Resort in June 2008, the representations in the business plan and limited partnership agreement for the limited partnerships, including, without limitation, the Phase 7 Partnership, were false in their assertion that (a) the funds of the limited partnership would be used only for the development of a specific improvement; (b) the limited partnership and their general partner would not use the monies invested in a partnership for a purpose unrelated to the purpose of the partnership without the written consent of two-thirds of the limited partners; (c) the partnership would not encumber the monies invested without the written consent of two-thirds of the limited partners of the partnership; (d) the monies invested by the limited partners in the limited partnership would remain under the control of the general partner for the limited partnership; and (e) the limited partnership would follow the business plan and use the monies invested in the limited partnership only to build the specific improvement identified in the business plan.

75.     After Mr. Quiros acquired the Jay Peak Resort in June 2008, the business plan and limited partnership agreement for each limited partnership, including, without limitation, those for the Phase 7 Partnership, were false and misleading in their omission and concealment of, among other things, the fact that (a) the assets of the limited partnership were being commingled

with not only the assets of the earlier partnerships but also the assets of Mr. Quiros and other companies controlled by him and other confederates of the defendants; (b) the liabilities of the limited partnership were being commingled with not only the liabilities of the earlier partnerships but also the liabilities of Mr. Quiros and other companies controlled by him and other confederates of the defendants, (c) the limited partnership was severally responsible for repayment of RJAI's margin loan, the proceeds of which were used to make purchases and pay expenses that had nothing to do with the purpose of the partnership or in some cases even the Jay Peak Resort program, (d) the treasury bills into which the investment monies of the partnership were converted were then collateralized to secure repayment of the margin loan; (e) the assets of the limited partnership were being spent by Mr. Quiros and the companies controlled by him and other confederates of the defendants for reasons not related to the partnership or in some cases even  the Jay Peak Resort; and (e) persons inside and outside the limited partnership had objected to commingling that began in 2008, four years before the first limited partners of the Phase 7 Partnership would invest.

76.     Beginning with the offering materials for the Phase 2 Partnership, Mr. Stenger and Mr. Quiros jointly contributed to the preparation of the business plan, limited partnership agreement, and other offering materials for each of the limited partnerships, including, without limitation, the Phase 7 Partnership.  Because Mr. Stenger and Mr. Quiros wrote, edited, read, reviewed, and/or approved these documents before distribution, they were aware of the false and misleading statements within these documents as described above.

77.     As both Mr. Quiros and Mr. Stenger intended, the immigrant investors, including, without limitation, the investors in the Phase 7 Partnership relied upon the misrepresentations and omissions in the offering materials to purchase limited partnership interest.

78.     In the SEC Enforcement Action, the SEC sued Mr. Quiros, Mr. Stenger, the Phase 7 Partnership, and AnC Bio for securities fraud based upon, *inter alia*, the misrepresentations and omissions described above.

THE IMPROPER COMMINGLING OF THE ASSETS AND LIABILITIES OF THE PARTNERSHIPS

79.     Beginning in 2008 and continuing through 2012, just as the defendants contemplated, an account for each of the Phase 1-7 Partnerships was set up at Raymond James to receive the investments made by the investors participating in that limited partnership.

80.     By the last quarter of 2012 all of the Phase 1-6 Partnerships were fully subscribed. Just as the defendants contemplated, Mr. Quiros took control of all of the investments made in these limited partnerships.

81.     From the last quarter of 2012 through April 2014, millions of dollars were invested in the Phase 7 Partnership, which was never fully subscribed.  Just as the defendants contemplated, Mr. Quiros took control of the investment monies in this limited partnership too.

82.     Just as the defendants contemplated, the accounts established at RJAI for the Phase 1-7 Partnerships gave signature authority on each of the accounts to Mr. Quiros, individually, but not to a general partner or any individual in his capacity as an officer, director, principal or manager of a general partner of the limited partnership.  Mr. Quiros was also the sole signatory on the other accounts established at RJAI for Q Resorts and the other entities connected to Jay Peak Resorts.

83.     Just as the defendants contemplated, most if not all of the investment monies deposited into the Phase 1-7 Partnerships were converted by RJAI into treasury bills.

84.     Just as the defendants contemplated, all of the treasury bills became collateral for the four multi-purpose margin loans owed to RJAI, thus, commingling the assets and debts of the limited partnerships and assets and debts owed by Mr. Quiros or entities that he controlled,

including, for example, Q Resorts, JPI and Jay Construction Management, Inc. ("JCM"), all of whom were confederates of the defendants.   At times, the advance of margin loan proceeds created negative balances in the accounts of the limited partnerships at RJAI.

85.     Just as the defendants contemplated, Mr. Quiros used the financial structure that they created to transfer investment monies from later partnerships, like the Phase 7 Partnership, to earlier ones and to commingle monies, so as to cover construction cost overruns, make distributions to limited partners of the earlier limited partnerships, make payments of interest on the margin loans owed to RJAI, and make transfers to himself and the other entities that he controlled, even though he was not due the monies at all or not due the monies in the amounts taken due to the construction delays that became obvious to the public in 2013-14.

86.     Just as the defendants contemplated, Mr. Quiros used their financial structure to set up an account for JCM, through which investment monies of the Phase 7 Partnership were cycled and transferred to earlier limited partnerships for payments to vendors for goods and services unrelated to the Phase 7 Partnership or transferred to the other accounts at RJAI controlled by Mr. Quiros or the entities that he and his confederates controlled.

87.     Because of the financial structure put in place by the defendants, Mr. Quiros had the ability to transfer funds from one partnership to another and the ability to spend money on himself and others without any right to do so, thus, using monies of the unwitting investors, particularly those in the Phase 7 Partnership, to pay for expenses that were unrelated to the written business plan for the Phase 7 Partnership, which plan Mr. Stenger instructed the investors in the Phase 7 Partnership and their attorneys or counselors to submit to the USCIS in their Forms I-526 in order to obtain permanent residence subject to conditions.

88.     By using the financial structure that the defendants had designed and were implementing to the unfair advantage of Mr. Quiros, the development program at the Jay Peak Resort operated, as intended, in a "Ponzi"-like manner, by allowing investments in the later partnerships, particularly the Phase 7 Partnership, to cover up the fraud, waste, and abuse in the earlier limited partnerships.

CONCEALMENT OF FRAUD BY THE DEFENDANTS

89.     From 2008 through 2014, the defendants helped Mr. Quiros conceal the fraud facilitated by the financial structure that they designed and implemented for him.

90.     Initially, in 2008 or 2009, employees and agents of the general partners for the limited partnerships formed pursuant to the EB-5 Program were able to review monthly statements for the accounts of these limited partnerships at RJAI.

91.     Once these employees and agents of the limited partnerships began to question in 2009 what appeared to be a pattern of commingling depicted in the monthly statements, Mr. Quiros told the defendants to cease providing access to the monthly statements to these individuals, making it far more difficult for them to detect the extent of the rampant commingling of assets and liabilities of the limited partnerships.

92.     The defendants willingly followed this instruction from Mr. Quiros, refusing to provide monthly account statements to these employees and agents, including, for example, the controller for the Jay Peak Resort and the limited partnerships.  Eventually, the initial controller found himself unable to perform his treasury function and resigned.

93.     Similarly, the controller from 2010-11, like the earlier one, has reported that he too was denied access to monthly statements for the accounts of the limited partnerships at RJAI. Nevertheless, the second controller was still able to observe evidence that the assets and liabilities of the Phase 1 and 2 Partnerships were commingled based upon monthly statements he

had received for the bank account of the Phase 1 Partnership at People's Bank in Burlington, Vermont.  This controller noticed and was disturbed by large transfers that had been received in the Vermont bank account of the Phase 1 Partnership from the account of the Phase 2 Partnership at RJAI.  When the second controller brought this information to the attention of multiple persons, including the outside accountant for Mr. Quiros, a person with whom Messrs. Burstein, Stenger, and Quiros communicated, no response was ever made to the concern expressed by the second controller.  Eventually, this controller as well, found himself unable to perform his treasury function and resigned.

94.   In 2011, Mr. Quiros opened up an account for JCM through which all construction expenses were paid for the improvements being built by the Phase 4-7 Partnerships. Mr. Burstein and the Anti-Money Laundering Department at RJAI then discussed the propriety of this arrangement based upon the large volume of transactions that were being generated in the account of JCM.  The defendants then agreed to facilitate the continued commingling of the assets and liabilities of the partnerships, so long as an invoice was obtained for each payment, but without any regard for which partnership the invoice was paid.

95.   The intricate web of transactions engineered and implemented by RJAI was another way to conceal the Ponzi-like nature of a financial structure that was created in direct violation of the written partnership agreements and business plans of the limited partnerships, including the Phase 7 Partnership.

96.   The money invested into the limited partnerships, including the Phase 7 Partnership, were converted into treasury bills, ninety percent of which could be advanced at the whim of Mr. Quiros for reasons totally unrelated to the partnership and in some instances even the Jay Peak Resort.  Even though the treasury bills remained in the account of the limited

partnerships, the reality was that these instruments were encumbered by multi-million dollar outstanding balances on margin loan(s), and, thus, at risk of being liquidated by RJAI at any time, leaving a partnership "holding the bag" for debt that Mr. Quiros never had any right to incur on behalf of the partnership in the first place.  This is exactly what happened to the Phase 7 Partnership.

THE DEFENDANTS' REFUSAL TO COMPLY WITH FINRA

97.    In or about October 2013, the Financial Industry Regulatory Authority ("FINRA") reviewed the accounts established at RJAI for the Phase 1-7 Partnerships and the margin loans.  FINRA objected to RJAI's cross-collateralization of these accounts to secure the multi-purpose margin loans that Mr. Quiros began using in 2008.

98.    Because the financial structure that the defendants designed and implemented commingled assets and liabilities of separate entities without any regard for the rights of investors, including, without limitation, immigrants whose right to permanent residency depended upon the number of jobs created in connection with a specific construction project, FINRA insisted that RJAI put an end to the multi-purpose, cross-collateralized margin loans.

99.    In addition to Mr. Burstein, other managers of RJAI learned of FINRA's objection, including, without limitation, Stephen J. Bartalo and John Carriero.[8]

100.    Despite the involvement of many different managers from RJAI, not until months later, in or about March 2014, did RJAI bother to comply with FINRA's instruction.  At that time, RJAI permitted Mr. Quiros to pay off the outstanding balance of the fourth margin loan

---

[8] According to FINRA, as of October 2013, Mr. Bartalo was broker who had worked with Raymond James for thirteen years.  Upon information and belief, Mr. Carriero is not a broker or investment advisor but rather a credit analyst of Raymond James.

owed to RJAI without making any effort to reverse the commingling that the defendants had designed and implemented over the preceding six-year period.[9]

101. Instead of reversing the commingling, RJAI allowed Mr. Quiros to use $18.2 million of capital contributions from the limited partners in the Phase 7 Partnership and $4 million from Mr. Quiros and the entities he controlled and no monies from any other partnership account. In other words, the majority of the fraud, waste, and abuse that plagued the partnerships was foisted upon the investors in the Phase 7 Partnership.

102. Before the defendants ceased doing business with Mr. Quiros, he withdrew investments in the Phase 7 Partnership on multiple occasions for improper uses, including, without limitation, the following:

a. Withdrawals between March and June of 2013 of $4.2 million to pay corporate taxes to the State of Vermont and the IRS for JCM, even though the Phase 7 Partnership was in no way responsible for these tax liabilities;

b. Withdrawal on May 30, 2013 of $2.2 million to pay for a luxury condominium at Trump Place on Riverside Drive in Manhattan, New York, where the ex-wife of Mr. Burstein took up residence with his child; and

c. Withdrawals from June 2013 to July 2014 of $5.5 million that were taken by Mr. Quiros and another entity that he controlled, GSI of Dade County, Inc. ("GSI"), through North East Contract Services, LLC ("NECS"), even though none of NECS, Mr. Quiros or GSI were entitled to this sum of money.

---

[9] The outstanding balance on the fourth margin loan in March 2014 reflected expenditures for which the Phase 7 Partnership was in no way responsible, including the purchase by Mr. Quiros, through Q Burke Mountain Resort, LLC ("Q Burke"), of a separate ski resort on Burke Mountain in East Burke, Vermont, and dozens of expenses for construction for the Phase 4-6 Partnerships.

103.    As of the date that the defendants ended their business relationship with Mr. Quiros and ordered him to close all of the accounts at RJAI through which he had funneled investment monies, (a) membership in each of the Phase 1-6 Partnerships was closed, as these entities had already sold all of their limited partnership interests to 564 investors, but (b) membership in the Phase 7 Partnership remained open, as that entity had sold limited partnership interests to only 139 investors.

104.    After the defendants ended their relationship with Mr. Quiros in or about April 2014, his ability to victimize the investors was reduced because he had difficulty finding another brokerage firm that was willing to facilitate the fraudulent scheme as RJAI had been willing during the preceding six-year period.

THE CURRENT STATE OF THE PHASE 7 PARTNERSHIP

105.    The cost to complete construction in December 2014 of the biomedical research facility, according to the original offering materials for the Phase 7 Partnership, is about $70 million.  According to the amended marketing materials, the cost to complete construction of the facility by May 2016 was to be about $85 million.  According to the SEC and the VDFR, the current cost to complete the construction of the biomedical research facility is about $84 million.

106.    The funds that are traceable to the Phase 7 Partnership are only about $19.2 million.  According to the VDFR and the SEC, as of today, there has been only minimal construction efforts (i.e., groundbreaking) on the biomedical research facility.

107.    As the Phase 7 Partnership is not fully subscribed, there is a difference of $27 million in the capital authorized ($110 million) and the capital actually raised ($83 million).

108.    According to the SEC and the VDFR, there is $43 million of investments missing to the detriment of the investors in the Phase 7 Partnership.

109.     It is unlikely that the investors in the Phase 7 Partnership will receive the return of the principal amount that they invested, let alone any return on the monies that they invested.[10]

110.     The missing investment money combined with the shortfall in the capital actually raised for the Phase 7 Partnership means that the Phase 7 Partnership will be unable to complete the construction of the biomedical research facility that was supposed to create the full-time jobs in a JCE so as to support Form I-829 petitions by the immigrant investors in the Phase 7 Partnership.[11]

111.     None of the limited partners who invested in the Phase 7 Partnership have been granted permanent residence.  It now appears that none of these investors will ever be able to obtain approvals by the USCIS of Forms I-829 for their investments in the Phase 7 Partnership and, thus, will not be allowed to permanently live and work in the United States based upon their investments in the Phase 7 Partnership.

112.     Based upon the foregoing, it appears that an award of not less than $71.7 million would be needed to compensate investors in the Phase 7 Partnerships.

MR. HILLER'S INVESTMENT IN THE PHASE 7 PARTNERSHIP

113.     On or about April 17, 2013, Mr. Hiller made a refundable deposit of $10,000 to purchase a limited partnership unit in the Phase 7 Partnership.

114.     On or about May 14, 2013, Mr. Hiller paid $540,000, which was the balance of the administrative or syndication fee and the purchase price for one limited partnership unit in the Phase 7 Partnership.

_____

[10] According to the SEC and VDFR, Mr. Quiros has looted approximately $50 million of the $365 million invested by the limited partnerships created under the EB-5 Program, indicating, once again, that most of the loss has been borne by the investors in the Phase 7 Partnership.

[11] Even Governor Shumlin acknowledges that "AnC Bio is likely a total bust, and that probably nothing will ever be built." http://www.vermonttoday.com/apps/pbcs.dll/article?AID=/RH/20160423/NEWS01/160429764.

115.     Before Mr. Hiller purchased a unit in the Phase 7 Partnership, he received and reviewed the original offering materials for the Phase 7 Partnership.

116.     In making this investment, Mr. Hiller relied upon, among other things, the business plan and limited partnership agreement in these offering materials.

a.   The business plan for the Phase 7 Partnership stated that the investment made by Mr. Hiller would be used to build a "world class" biomedical research facility with clean rooms in a sterile environment and high-tech equipment that scientists need for research efforts.

b.   The limited partnership agreement for the Phase 7 Partnership stated that (i) the business of the partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts at banks or financial institutions in the name of the partnership, which accounts were to controlled by the general partner;  (iii) the general partner would not borrow from the funds of the partnership; and (iv) the general partner would not permit the monies contributed to the partnership to be commingled with the funds of another person.

117.     On May 17, 2013, the Phase 7 Partnership issued a certificate to Mr. Hiller to evidence his purchase of a limited partnership interest in the partnership.   (A copy of the certificate is attached as Exhibit A.)

118.     In connection with his efforts to become a permanent resident in this country, Mr. Hiller, like most other immigrants investing in the Jay Peak Resort, hired an immigration attorney.  Among other things, the attorney prepared the Form I-526 that was supported by the original offering materials, including, without limitation, the limited partnership agreement and business plan for the Phase 7 Partnership, together with additional information about direct and indirect employment that would result from the construction of the biomedical research facility

and operations at the facility post-construction, which, according to the general partner and its economists, would lead to the creation of more than 2,500 full-time jobs.

119.    On September 18, 2013, Mr. Hiller, through his attorney, submitted the Form I-526, annexed to which were documents and information, including, without limitation, all that is described in paragraphs 87 and 118.

120.    On May 22, 2015, Mr. Hiller married Adriana Lemmen Meyer Antillon ("Ms. Lemmen"), on whose behalf Mr. Hiller applied, on October 23, 2015, for conditional residency as a derivative beneficiary.

121.    On February 6, 2015, USCIS approved Mr. Hiller's Form I-526 petition.  Upon approval of the Form I-526 petition, Mr. Hiller and Ms. Lemmen filed an application for an immigrant visa with the U.S. Department of State.  The visas were approved and Mr. Hiller and his wife were admitted to the United States as conditional residents on March 1, 2016.

122.    To date, Mr. Hiller has paid his immigration attorney $30,000 to assist him in becoming a permanent resident of the United States through the EB-5 program.

123.    On or about April 15, 2015, Mr. Hiller learned of the SEC's Enforcement Action and that the Phase 7 Partnership in which he had invested was a "Ponzi" scheme.

### CLASS ACTION ALLEGATIONS PURSUANT TO S.D. FLA. L.R. 23.1

124.    Pursuant to subdivision (a) and paragraph (b)(3) of Rule 23 and Local Rule 23.1, Mr. Hiller brings this class action on behalf of himself and all others similarly situated.

NUMEROSITY

125.    Pursuant to paragraph (a)(1) of Rule 23, the members of the class are so numerous that separate joinder of each member of the class is impracticable.  There are 139 limited partners in the Phase 7 Partnership who lost their investment and suffered damages as a result of

the fraud that was facilitated by the defendants before they ended their relationship with Mr. Quiros in April 2014.

COMMONALITY

126.   Pursuant to paragraph (a)(2) of Rule 23, common questions of fact and law pervade the class.  The overall question is whether the defendants participated or substantially assisted, knowingly or with willful blindness, in the commission of wrongful conduct related to the sale of limited partnership interests in the Phase 7 Partnership.  A class action is the most efficient and effective device for resolving the claims alleged herein against the defendants.

127.   The following are specific issues of fact common to all members of the class:

a.   The uniform manner in which the investors in the Phase 7 Partnership were induced by Mr. Quiros and others to invest in the partnerships;[12]

b.   The materiality of certain false statements and omissions in the written offering materials;

c.   The intentional design by the defendants of a financial structure for the entities connected to the Jay Peak Resort that was a scheme to defraud in connection with the sale or purchase of a security induced by false and misleading statements in the business plan and the limited partnership agreement for the Phase 7 Partnership;

d.   The implementation of said financial structure by a series of intricate and deceptive transactions in which the defendants participated for substantial consideration and compensation.  The transactions served no legitimate purpose other than to obfuscate the Ponzi-like nature of the Jay Peak Resort development program and operated as a fraud or deceit upon the persons who purchased limited partnerships in the Phase 7 Partnership;

---

[12] Indeed, the written offering materials contained merger and integration clauses that disclaim any representations not contained within the offering materials.

e.   The concealment of the fraud by the defendants in the face of explicit warnings, stated concerns of third persons uninvolved in the fraud, and the objection of FINRA; and

f.   The measure and amount of damages suffered by the Class.

128.   The following are specific issues of law common to all members of the class:

a.   Whether the business plan and limited partnership agreement for the Phase 7 Partnership are fraudulent;

b.   Whether the development program at the Jay Peak Resort was used like a Ponzi scheme, and whether the Phase 7 Partnership was part of a fraudulent scheme that operated in a Ponzi-like manner;

c.   Whether the defendants designed the financial structure for the Jay Peak Resort with knowledge or willful blindness that the financial structure would be used illegally to facilitate a fraudulent scheme that operated in a Ponzi-like manner;

d.   Whether the defendants implemented the financial structure for the Jay Peak Resort with knowledge or willful blindness that the financial structure was being used illegally to facilitate a fraudulent scheme that operated in a Ponzi-like manner;

e.   Whether the defendants participated in a fraudulent scheme in connection with the purchase of investments in the Phase 7 Partnerships;

f.   Whether the defendants participated in a fraudulent scheme in connection with the purchase of investments in the Phase 7 Partnership that was intended to operate and did operate in a Ponzi-like manner;

g.   Whether the defendants aided and abetted a fraudulent scheme that operated in a Ponzi-like manner;

h.   Whether the defendants aided and abetted fiduciary breaches of AnC Bio, Mr. Stenger or Mr. Quiros;

i.   Whether the defendants combined, confederated, agreed, and/or conspired with Mr. Quiros and others to further a fraudulent scheme that operated in a Ponzi-like manner; and

j.   Whether the defendants are liable, jointly and severally, to the Class for the damages proximately caused by the Class.

TYPICALITY

129.   Pursuant to paragraph (a)(3) of Rule 23, the claims of Mr. Hiller are typical of the claims of each member of the Class.  The legal claims asserted in this action, as well as the facts underlying those claims, are the same as would be advanced by all members of the Class were they forced to institute individual actions.  In addition, all members of the Class suffered the same or similar damages as a result of the same course of misconduct.

ADEQUACY OF REPRESENTATION

130.   Pursuant to paragraph (a)(4) of Rule 23, Mr. Hiller is an adequate representative of the Class and will fairly and adequately protect the interests and rights of the Class.  As Class Representative, Mr. Hiller is aware of his duties on behalf of the Class and has agreed to undertake those responsibilities to the best of his ability.  The claims of the Class Representative are not antagonistic in any way to the interests of other Class members, nor are there any significant conflicts of interest between the Class Representative and any members of the Class. The Class Representative is committed to the vigorous prosecution of this action.  Like the other members of the Class, the Class Representative is unlikely to have the conditions of his permanent residency removed.   Like the other members in the Class, there was no improvement constructed (only minimal groundbreaking) with the monies invested by Mr. Hiller.  The losses sustained by Mr. Hiller are identical to those in other members of his class.

131.    The Class Representative has retained undersigned counsel to represent him in this action.  Said counsel are experienced in class action and complex commercial litigation matters, and are financially able and sufficiently staffed to see this case through conclusion.

TYPE OF CLASS ACTION

132.    Pursuant to paragraph (b)(3) of Rule 23, the questions or law or fact common to class members, as identified above, predominate over any questions affecting only individual members, and a class action is superior to any other method that may be available for fairly and efficiently adjudicating the controversy.  Further, given the disparity of the resources of RJAI and any individual member of the class, a class action is superior to individual actions.  The class has a high amount of cohesion in that all of the investors who make up the Class invested in the same limited partnership.  Further, most if not all of the investors are immigrants who invested in the Phase 7 Partnership for the purpose of obtaining permanent residency in the United States. Unlike the investors in the earlier partnerships, because of the absence of any meaningful development or construction in the seventh phase of the development program of the Jay Peak Resort, it appears that all of the investors in the Phase 7 Partnership will be unable to secure approval of a Form I-829 for their investments in the partnership.  In addition, unlike the investors in the earlier partnerships, there is no improvement constructed with the investment monies that can be sold to recoup the investments by the Class.

133.    It is best to permit this class action to proceed in this judicial district.  There is no other forum more convenient or desirable than this judicial district for the litigation of this class action, because this is the judicial district in which the defendants, Mr. Quiros and other confederates of the defendants may be found and where the alleged misconduct of the defendants was committed.  In addition, this is the judicial district where the SEC filed on April 12, 2016 the civil enforcement action, in which action the Receiver for the Jay Peak Entity Entities was

appointed.  In addition, the Daccache Class Action has already been commenced in this judicial district.

134.    There are no significant or unusual difficulties associated with the facts and legal theories underlying the claims in this class action, which preclude this case from being maintained as a class action.

135.    The undersigned counsel anticipate coordinating their efforts for the benefit of the Class that they seek to represent with the efforts of the Receiver, counsel who seek to represent other classes of investors, and the district judges and courts to which litigation related the Jay Peak Resort are assigned.

136.    All conditions precedent to the assertion of claims below have been performed, have occurred, or have been waived.  Alternatively, the defendants are estopped to raise any alleged condition precedent.

COUNT ONE:    **PRIMARY LIABILITY FOR A SCHEME TO DEFRAUD IN VIOLATION OF SECTION 10(B) OF THE SECURITIES EXCHANGE EXCHANGE ACT OF 1934 AND RULE 10B-5(A), (C) OF THE SEC**

137.    The Class Representative re-alleges and hereby incorporates the allegations in paragraphs 1 through 136.

138.    This is a claim by Mr. Hiller, individually and as Class Representative, to impose liability upon the defendants for violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(a), (c) of the SEC.

139.    The defendants directly or indirectly, by use of a means or instrumentality of interstate commerce and the mails have employed a device, scheme, or artifice to defraud, and engaged in a deceptive act, practice or course of business that operated as a fraud or deceit upon the investors and engaged in an act, practice or course of business that operated as a fraud or

deceit upon the investors who purchased limited partnership interests in the Phase 7 Partnership, and on whose behalf the Class Representative makes this claim.

140.     Mr. Quiros and Mr. Stenger made or caused to be made misrepresentations in the uniform offering materials that were provided to the investors in the Phase 7 Partnership, including, without limitation, those set forth below:

a.   All investors in the Phase 7 Partnership were provided with uniform written offering materials that included a written business plan that represented the use that would be made of the funds that the investor contributed, including the improvement to be constructed with the monies invested and how development would lead to the creation of jobs, which information was required by federal immigration law to be included with the Forms I-526 submitted by immigrant investors to the USCIS.  8 C.F.R. § 204.6.

b.   All investors in the Phase 7 Partnership were provided with uniform offering materials that included a written formation document for the Phase 7 Partnership that identified the general partner of the partnership and its president.  In addition, the formation document stated that (i) the business of the partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts at banks or financial institutions in the name of the partnership, which accounts were to controlled by the general partner;  (iii) the general partner would not borrow from the funds of the partnership; (iv) the general partner would not permit the monies contributed to the partnership to be commingled with the funds of another person; and (v) the general partner would not encumber the monies contributed by the investor to the partnership.

141.     The representations made in the business plan and limited partnership agreement were false when made for reasons already explained in this pleading.

142.    The defendants had a copy of the limited partnership agreement for the Phase 7 Partnership; or, alternatively, if they did not have this fundamental formation document, then such was the result of their willful blindness and conscious disregard for the obligation that the defendants owed to "Know Your Customer," including, without limitation, the individuals who are authorized to act on behalf of the customer, a duty that required RJAI to obtain the limited partnership agreement for each partnership, including, without limitation, the Phase 7 Partnership, before opening an account for the partnership at RJAI.[13]

143.    The defendants had a copy of the business plan for the Phase 7 Partnership; or, alternatively, based upon their extensive discussions with Mr. Quiros and others before and after he purchased the Jay Peak Resort, the defendants knew that Mr. Quiros was developing the Jay Peak Resort with financing sought from immigrants through the EB-5 Program, and that any potential investor in the partnerships, including, without limitation, the Phase 7 Partnership, was necessarily told in a business plan and necessarily understood before investing that (a) the Phase 7 Partnership, like the earlier partnerships, was a closed-ended fund, selling a limited number of membership interests to raise financing pursuant to the EB-5 Program; (b) the Phase 7 Partnership, like the earlier partnerships, would be conducting its affairs in accordance with the EB-5 Program; (c) the Phase 7 Partnership, like the earlier partnerships, was building specific improvement(s); (d) the monies placed at risk by investors in the Phase 7 Partnership, like the earlier partnerships, would be used to create jobs for which investors in the Phase 7 Partnership could take credit in their immigration petitions; (e) the commingling of the assets and liabilities

---

[13] A broker or investment advisor who purposely decides not to request the formation document for an account in which millions of dollars are to be deposited and withdrawn on behalf of a customer cannot be said to act without knowledge.  Such conduct is willful blindness, which is circumstantial evidence of actual knowledge.  At all times material hereto, the Respondents owed to the Phase 7 Partnership the duty to "Know Your Customer" and the individuals duly authorized to act for the customer pursuant to either NYSE Rule 405 or FINRA Rule 2090.

of the Phase 7 Partnership with earlier partnerships and other entities and the operation in Ponzi-scheme fashion of the limited partnerships, including, without limitation, Phase 7, would prevent the immigrant investors, particularly those buying limited partnership interests in a later partnership, from proving to the USCIS that each of their investments created ten jobs, thus, entitling them to permanent residency in the United States without conditions.

144.    Alternatively, given the circumstances present in this case and described throughout this pleading, the defendants acted with severe recklessness as to whether the representations made to the investors in the business plan and limited partnership agreement for each of the partnerships, including, without limitation, the Phase 7 Partnership, were false, misleading, and likely to induce the investors to purchase investments that they never would have purchased had they known the truth about the transactions between the limited partnerships and RJAI.

145.    Beginning in 2008, each time that a new account was opened for another limited partnership formed pursuant to the EB-5 program, including the Phase 7 Partnership, the defendants and Mr. Quiros set up the account so that Mr. Quiros could take control of the assets of the partnerships.

146.    Beginning in 2008, all investments made by the limited partners, including, without limitation, the investors in the Phase 7 Partnership, such as Mr. Hiller, were initially transmitted to accounts of the partnerships maintained primarily, if not exclusively, in the People's Bank in Burlington, Vermont.  Each partnership, including, without limitation, the Phase 7 Partnership, had control, through its general partner, of the funds on deposit in this local bank account.

147.    Pursuant to the financial structure designed and implemented by the defendants, Mr. Stenger transmitted the funds out of the bank account at People's Bank for each limited partnership, including, without limitation, the Phase 7 Partnership, to the account opened for the partnership at RJAI, which accounts were under the control of Mr. Quiros, individually.

148.    From 2012 through 2014, the defendants participated in numerous transactions that had no legitimate purpose other than to commingle the assets of the Phase 7 Partnership with the assets of other entities that were not entitled to the assets.

149.    From 2012 through 2014, the defendants participated in numerous transactions that converted the assets of the Phase 7 Partnership into treasury bills and then encumbered the treasury bills with a lien to secure debts on the fourth margin loan.

150.    From 2012 through 2014, the defendants participated in numerous transactions that misused the assets of the Phase 7 Partnership to repay the fourth margin loan, which loan was used to pay expenses and debts contrary to the business plan and the limited partnership agreement of the Phase 7 Partnership.  Instead of using the investments to build the biomedical research facility that this partnership was formed to develop, the investments were used to pay debts and expenses for which the partnership was in no way responsible.

151.    The defendants knew that the above representations would be made, were being made and had been made to the limited partners, including, without limitation, the investors in the Phase 7 Partnership, and that the foregoing misrepresentations were false and misleading and that the intricately deceptive series of transactions participated in by the defendants obfuscated the falsity of the representations by permitting the limited partnerships, including, without limitation, the Phase 7 Partnership, to commingle for an extended period of time their assets and liabilities by the use of margin loans and the use of accounts at RJAI, like the accounts

established for JCM and Q Resorts.  The foregoing loan and accounts were used to suggest that monies were transferred from the Phase 7 Partnership for a legitimate partnership purpose when, in fact, the money transfers were not for a legitimate purpose connected to the Phase 7 Partnership.

152.    According to the circumstances that existed from 2008 through 2014, as described throughout this pleading, the defendants knew that they had designed and that they were participating in a scheme to defraud the investors who made, were making, and would make investments in the limited partnerships, including, without limitation the Phase 7 Partnership; or, alternatively, the financial structure designed and implemented by the defendants to do business with Mr. Quiros had operated, was operating and would operate as a fraud on the investors who had made an investment in the limited partnerships, including, without limitation, the Phase 7 Partnership.

153.    In addition, further evidence of the scienter of the defendants may be found in their active concealment, in the face of multiple warnings, of their commingling and participation in transactions that misused funds of the partnerships, including, without limitation, the Phase 7 Partnership, for illegitimate purposes not related to the partnership; the refusal of the defendants to heed the warning of the seller of the Jay Peak Resort before permitting Mr. Quiros to use "OPM," *i.e.*, monies invested by the immigrants in the Phases 1 and 2 Partnerships, to purchase the Jay Peak Resort; refusing to permit controllers who handled the financial affairs of the limited partnerships to review monthly statements for the accounts of the partnerships at RJAI; ignoring warnings from RJAI's internal Anti-Money Laundering Department based upon the high volume of transactions; engaging in further commingling even after FINRA told the defendants that the use of margin loans for the limited partnerships must cease.

154.   Alternatively, the defendants engaged in the conduct alleged in paragraphs 145 through 153 with severe recklessness.

155.   Because the defendants designed, implemented and participated in the scheme to defraud, they are primarily liable to the investors whose investments in the Phase 7 Partnership would never have been made but for being duped by the scheme to defraud that the defendants designed, implemented, and participated in from 2008 through 2014.

156.   The members of the Class have suffered substantial economic damages in an approximate amount not less than $71.5 million, exclusive of payments to their immigration attorneys and advisors, as a proximate result of the scheme to defraud that was designed and implemented by the defendants.  Class members have not received any return on their investment and their hopes of obtaining permanent residency in the United States have been dashed because the Ponzi scheme means construction that would have created jobs for the investors in the Phase 7 Partnership cannot go forward and there will be no removal of the conditions associated with their I-526 petitions, for which nearly all investors, including, without limitation, Mr. Hiller have engaged and paid substantial legal fees and expenses to immigration attorneys.

WHEREFORE, the Class Representative, both individually and on behalf of the Class, demands judgment against the Defendants, Raymond James and Associates, Inc. and Joel Burstein, jointly and severally, for compensatory damages, special damages for fees and expenses incurred to obtain permanent residency in the United States, legal fees and costs in this lawsuit to the extent permitted by law, and such other and further relief that the Court deems just and proper.

COUNT TWO:        AIDING AND ABETTING FRAUD

157.   The Class Representative re-alleges and hereby incorporates the allegations in paragraphs 1 through 136, 140-43, and 145-54.

158.    This is a claim by Mr. Hiller, individually and as Class Representative, to impose liability upon the defendants for aiding and abetting a fraud committed by Mr. Quiros and Mr. Stenger.

159.    Mr. Quiros and Mr. Stenger made material misrepresentations and omissions in the offering materials, as described hereinabove, and committed the fraud that has been described at length elsewhere in this pleading.

160.    The defendants had actual knowledge of the fraud and misrepresentations in the business plan and the limited partnership agreements.

161.    The particular circumstances that indicate the actual knowledge of the defendants in this regard have been detailed elsewhere in this pleading.

162.    As detailed elsewhere in this pleading, the defendants substantially assisted Mr. Quiros and Mr. Stenger in duping and defrauding the investors in the Phase 7 Partnership with respect to the matters misrepresented in the business plans and the limited partnership agreements.

163.    The investors in the Phase 7 Partnership relied upon the false and misleading misrepresentations and fraud to make investments in the Phase 7 Partnership, and were substantially damaged as a proximate result of the misrepresentations and fraud that the defendants aided and abetted Mr. Quiros and Mr. Stenger in committing.

164.    The specific misconduct of the defendants that gives rise to this claim of aiding and abetting fraud and misrepresentations was intentional, and, therefore, pursuant to section 768.72 of the Florida Statutes, the Class Representative requests an award of punitive damages.

WHEREFORE, the Class Representative, individually and on behalf of the Class, demands judgment against the Defendants, Raymond James and Associates, Inc. and Joel

Burstein, jointly and severally, for compensatory damages, special damages for fees and expenses incurred to obtain permanent residency in the United States, legal fees and costs in this lawsuit to the extent permitted by law, punitive damages and such other and further relief that the Court deems just and proper.

<strong>COUNT THREE:         AIDING AND ABETTING FIDUCIARY BREACH</strong>

165.    The Class Representative re-alleges and hereby incorporates the allegations in paragraphs 1 through 136.

166.    This is a claim, individually and as Class Representative, to impose liability upon the defendants for aiding and abetting a fiduciary breach committed by AnC Bio, Mr. Stenger and Mr. Quiros.

167.    AnC Bio, Mr. Stenger, and Mr. Quiros owed fiduciary duties to the Phase 7 Partnership.

168.    The defendants knew that the Phase 7 Partnership was a limited partnership and that the general partner and its principals owed fiduciary duties to the Phase 7 Partnership.

169.    The defendants that knew that these fiduciary duties were breached on numerous occasions based upon the specific conduct of the AnC Bio, Mr. Stenger, and Mr. Quiros, as detailed elsewhere in this pleading.

170.    For example, when monies contributed by the investors to the Phase 7 Partnership were transmitted from People's Bank into the account of the Phase 7 Partnership at RJAI, there was a breach of fiduciary duty, because the signatory of the Phase 7 Partnership account at RJAI was Mr. Quiros, individually, rather than the general partner of the Phase 7 Partnership, and Mr. Quiros repeatedly used the monies not for a partnership purpose or even for the Jay Peak Resort in general, but rather for his own selfish reasons, thus, causing immense injury to the investors in the Phase 7 Partnership.

BENNETT AIELLO • 25 Southeast Second Avenue, Eighth Floor • Miami, Florida 33131

171.    From the outset of their involvement, the defendants had this corrupt knowledge, yet nevertheless substantially assisted and encouraged the fiduciary breaches, at least through March 2014, by designing and implementing a financial structure for the Jay Peak Resort that turned the use of the EB-5 Program at that resort into a Ponzi scheme.

172.    The specific misconduct of the defendants that gives right to this claim of aiding and abetting a fiduciary breach was intentional, and, therefore, pursuant to section 768.72 of the Florida Statutes, the Class Representative requests an award of punitive damages.

WHEREFORE, the Class Representative, individually and on behalf of the Class, demands judgment against the Defendants, Raymond James and Associates, Inc. and Joel Burstein, jointly and severally, for compensatory damages, special damages for fees and expenses incurred to obtain permanent residency in the United States, legal fees and costs in this lawsuit to the extent permitted by law, punitive damages and such other and further relief that the Court deems just and proper.

COUNT FOUR:        CIVIL CONSPIRACY

173.    The Class Representative re-alleges and hereby incorporates the allegations in paragraphs 1 through 136.

174.    This is a claim to impose liability upon the defendants for civil conspiracy.

175.    Beginning in or about the first half of 2008, the defendants made an agreement with Mr. Quiros regarding the commission of unlawful acts, including, without limitation, fraud and fiduciary breaches in connection with the limited partnerships formed and to be formed for the Jay Peak Resort, including, without limitation, the Phase 7 Partnership.

176.    The defendants carried out overt acts, including, without limitation, violations of Rule 10b-5, aiding and abetting fraud, aiding and abetting fiduciary breaches, and other

misconduct, in furtherance of the unlawful agreement that the defendants and Mr. Quiros first made in the first half of 2008.

177.    As a proximate result of the conspiracy to defraud, the investors in the Phase 7 Partnership have suffered substantial damages.

178.    The specific misconduct of the defendants that gives right to this claim of civil conspiracy was intentional, and, therefore, pursuant to section 768.72 of the Florida Statutes, the Class Representative requests an award of punitive damages.

WHEREFORE, the Class Representative, individually and on behalf of the Class, demands judgment against the Defendants, Raymond James and Associates, Inc. and Joel Burstein, jointly and severally, for compensatory damages, special damages for fees and expenses incurred to obtain permanent residency in the United States, legal fees and costs in this lawsuit to the extent permitted by law, and such other and further relief that the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

179.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Class Representative demands a jury trial on all claims and issues triable by right to a jury.

Respectfully Submitted,

Attorneys for Carlos Hiller

BENNETT AIELLO
The Ingraham Building, Eighth Floor
25 Southeast Second Avenue
Miami, Florida 33131-1603
Phone: (305) 358-9011
Facsimile: (305) 358-9012

By:       /Paul Aiello/
          Paul Aiello, FBN 0909033
          Michael P. Bennett, FBN 0775304
          Jeremy R. Kreines, FBN 101119